Good morning, and thank you for hearing the appeal. We have a short time. I know you're all well prepared and versed, so I won't try to be redundant with the briefs. What I will try to do is point what I think are the most important factors, the first one of which is this was a verified complaint filed in state court. There are three remaining clauses of action, the FEA dealing with age, labor code, and the business and professions code. It was removed for diversity, and the state substantive law applies. The application of state law, and this was raised clearly in the opening brief on pages 12 to 18. Appellant did not respond to that particular issue. The plan that is in focus here. MS. GOTTLIEB Let me see if I can focus the argument. It seems to me that you have produced essentially no evidence with regard to the disparate impact cause of action. So you must be arguing that this is on its face, a disparate impact plan, and if so, would you explain why that is? There's no evidence to show that in fact this disparately impacts older people as opposed to younger people. You have no statistics, no numbers, no nothing except the fact that this particular guy is older, and he wasn't even older when he started. So the question is, don't you have to prevail, if at all, just on a facial look at this plan, and can you do that? THE COURT Exactly what I think we can do. I think you look at the plan, and 100 percent of the people with two years or less are not subject to being terminated. And 75 percent of the people are disproportionately under 40. I would say anything that is graded on people in the older classifications are more senior. I think there are some cases that  THE WITNESS Well, we don't have such a graph. You haven't given us any. THE COURT What? THE WITNESS You haven't given us such a graph, either a general one or a specific one. THE COURT Well, here we have this. Morgan Stanley, when it framed this, purposefully made this a blind evaluation, even though it had access to the EEO-1 status of everybody in the company. Therefore, totally, purposefully disregarded that. THE WITNESS But couldn't you have done discovery and gotten that EEO-1 document and told us what the numbers actually were? THE COURT I think you, I purposefully, I mean, we could have bombarded you with a mile of facts here. The fact of the matter is that 100 percent of the people who are in two years or less and 75 percent of the people in 25 months to 48 months are exempt from being terminated or compared with any other person. So this is not to say you don't know whether they made a dollar for Morgan Stanley, $10, $20, $50. My client was just short by $3,000. What was not considered in the plan was past production. That reflects adversely against seniors. What was not included in the plan was any consideration of the $800,000 to $1 million that was sitting in Morgan Stanley's account that was brought there by Mr. Pugil. What was not considered in the plan was a program that Morgan Stanley sponsored a couple years before that, which switched stockbrokers from being paid on a commission basis to being on an asset basis. Now, that was done by the financial consultant's choice. And the people who took up the program were those who were best able to afford it, which were the senior performing  MS. MATHIS Are you going to, I find that the absence of evidence, this is all very interesting, but you have an age discrimination case, and you have to explain to us why this may have been a really miserable plan, and it may be intuitively likely that this has a disparate impact based on age, but you haven't demonstrated it. So maybe you want to go on to the labor code issue. MR. BROWN Well, it is my understanding of California law that the burden is on the people who are presenting the plan to justify how it meets the standards of the classification of the fair employment and housing act. MS. MATHIS And after you've got a prima facie case that this has a disparate impact based on age,  MR. BROWN As you indicated in your first question, the question is a close examination of the plan itself. If the plan itself, absent the factors that should have been in the thing, and with the fact that anything that has a disparate treatment over a stared thing based on experience has got to affect senior people more than junior people. But how do we know that, given the record that we have here in front of us, we know from your client that they take on people at age 47. So if your client is anything other than an absolute solo in a company, we're going to have people in that first group, the trainees, 1 through 24 months, who are 47, 48 years old. They're not going to be entirely composed of kids. And without some data as to the age of the people in that group, I'm having to guess at what the actual impact is, even once I kind of figure, well, it tends to be people at the beginning are younger. That generally is true, but I'm supposed to guess at this? MR. BROWN I don't think you guess at this. I think the plan by itself on its face says we are going to do this on a blind way, because if we try to do any open analysis of it, it would be prejudicial. Your point is well taken, however. My client was 47, but he was an exception to those going in. MS. GOTTLIEB But we don't know that. We have no record on that. We're a court. We deal with evidence. MR. BROWN I understand, but I have – what I have said is if you look at the – MS. GOTTLIEB Did you do discovery? MR. BROWN Hmm? MS. GOTTLIEB Did you do discovery? MR. BROWN We were into this thing. We went from state court to federal court to motion for summary judgment with virtually no discovery. It was very, very fast. MS. GOTTLIEB Did you ask for it? MS. GOTTLIEB Did you file a 56-F motion and say I'd like to get some discovery? MR. BROWN Well, when you say did I ask for it, we were into a motion for summary judgment almost immediately. MS. GOTTLIEB Okay. And then you don't have a rule for a 56-F? When you file – if there's a motion for summary judgment filed and you say wait a minute, we're not up to that yet because I need to do some discovery. Did you do that? MR. BROWN I think that was part of my argument. I have not gone back to that particular issue at the point. Because it was – JUSTICE SCALIA Wouldn't you ask Judge Reel for discovery? MR. BROWN We were into summary judgment. I was responding to that almost immediately. And Judge Reel moves his calendar along very fast. So we were – it was – JUSTICE SCALIA I don't know if you were ambushed at that point. MR. BROWN I got ambushed, yes. I'm not saying that in a mean-spirited way. I have a great deal of respect both for counsel and for Manny Reel. MS. GOTTLIEB Do you want to briefly address the labor code issue?  MS. GOTTLIEB Do you want to briefly address the labor code issue? MR. BROWN The labor code issue, as we've joined here in the briefs, opposing counsel says that the amount of money that was paid after 30 days was money that was not earned, but he's using that as equivalent of money not calculated. Historically under the labor code, you have to make those monies paid, go to the extra effort if you're terminating employees, which is a fundamental public policy issue under Labor Code 200 through 203. MS. GOTTLIEB I don't know if it's true in this case, but it could be true that the numbers just aren't available at that point. I mean, for example, I don't know about in this instance, but it could be that if it's a commission-based payment that the sales figures aren't available yet or whatever. MR. BROWN Well, we're talking about a very large corporation. A very large corporation is required to do the calculation and to pay them on the basis of the information they have available. And on sales commissions, unless there is something yet to be done by the salesman, he has earned those commissions and he's entitled to them upon the date of discharge. MS. GOTTLIEB Maybe the billing yet has to be done. Maybe the billing hasn't been done, so they don't have a record of it. MR. BROWN Well, this happens daily. MS. GOTTLIEB I'm sorry? MR. BROWN This happens all the time. MS. GOTTLIEB Do we have a record on that? MR. BROWN They have the commissions. Whatever has been sold as of the date is established what the value is. The only thing is they pay twice a month. MR. BROWN So what's the remedy here? MR. BROWN The remedy is up to 30 days' pay. It's not a heavy fine, but the salary that he was earning. And it's one thing if it was unearned. That is, if there was something. MR. BROWN How much money is that? MR. BROWN One month's pay is, I have forgotten just right offhand. I haven't done the calculation here. It's in the transcript, so exactly what it is. But the simple thing is the question of if commissions are earned, there are many salesmen where there are things that have to be done after the sale before he's fully earned his commission. But in selling a stock or calculating the asset-based interest he is to get, those are simply events that have occurred. He is entitled to the money, and he's supposed to be paid that money, even though it's an inconvenience to the employer. And mind you, the employer planned this particular thing of reduction in force well ahead of time, could have put into effect all the steps necessary in California to pay the people upon discharge, and it didn't do so. It isn't a matter of not earning it. It's a matter of not calculating it. And they had the time and opportunity to do it. Why don't we hear from the SEC? Good morning. I'm Jim Bidman representing Morgan Stanley. I agree with the Court. There's no evidence at all on the issue of age discrimination. The plaintiff has not established his prima facie case, and the argument is based on pure speculation. What was the procedural sequence? Is it true that the case was removed and instantaneously there was a summary judgment motion filed? No. We wanted to set the record straight. There was no ambush. I think the record reflects that the record before this Court reflects that we served interrogatories, and plaintiffs responded. In the Federal Court or the State Court? Federal Court. We were moved within 30 days of service and served interrogatories. Plaintiffs responded. Those are in the record. We took plaintiffs' depositions, and the plaintiffs conducted depositions of some Morgan Stanley employees. So there was no ambush. There was no arrest of judgment. The case did move quickly. And it isn't that they asked you for statistical evidence and it wasn't given? That's correct. It was not requested. That's correct. Unless the Court has some further question on the issue of age discrimination. I do have one question, and that is moving on to the timeliness of payment. What's your excuse for not paying timely? It was not timely unless you've got some reason why. It was, in our view, it was paid timely. And the purpose of the statute as I see it is to, when a company or an employer makes a decision to terminate an employee, the amount of money that is due at that time is to be paid immediately. In this case, the first half-month's draw that Mr. Puzo was entitled to was submitted by direct deposit to his bank account on November 15th, the date of his termination. That doesn't make a lot of sense. Because let's say you have somebody who has worked one week out of the two-week period that he would have been, so he is fired a week before his, he would ordinarily be paid for the week that he worked. My understanding of the Labor Code section is you owe him that money when he's fired out a week later. Is that right? That's as to the money that's calculable at that time. Right. And that was earned at that time. So the answer can't be that it's because you usually pay every two weeks. It has to be some other reason. Well, correct. He would be, in that case, entitled to the half-month's draw. And at the end of the month, when the company conducts its end-of-the-month FAA comp calculation, he would be entitled to the remainder. But why couldn't he do that calculation immediately? Because at the time, they don't know at that time whether all monies have been received. Does he owe the money only if the clients have paid? In some circumstances. But in some cases, the clients. Is that a circumstance here? No. In this case, the commission policy, which I believe the DSLE letter that we relied on said is reasonable. When you have a policy that provides for calculations at the end of the month for business reasons, it's reasonable to pay at that period of time. You couldn't calculate it the day he leaves. Well, you can't calculate it the day he leaves because at that time, you don't know what else he's entitled to. Well, wait a minute. We don't. I mean, the answer is we don't know. I mean, because the record's not here. And the answer is, really, where's the burden? Because we don't know whether this is just your practice or whether there is some practical reason you couldn't do this. Offhand, it's very hard for me to see why there's a practical reason that you couldn't do it. And this is a financial institution that presumably clears every day and knows what sales have been made. So it's not at all plain to me why you couldn't do it. But maybe there's a reason, but you haven't shown it to us. In fact, this is not what you usually do isn't the reason. Well, that's correct. But when you have a policy that is based on commissions, paid based on monies that are received throughout the month, the DSLE letter that we relied on said it's reasonable, and in those circumstances, penalties should not be awarded. One DSLE letter I know about says essentially that if there is – if it cannot be calculated until after an event has happened or if it cannot be ascertained until the happening of a commission subsequent, it doesn't say simply because that's not how you do things. Well, that's correct. And it's our position that in this case, based on the record, monies cannot be calculated. The full commission – What does the record show about this? And who is the burden – what would the burden be on you to show that you couldn't do it for some reason? That – well, I think the burden is just to show what our practice is and that the policy is reasonable. Even assuming that the DSLE letter is just not a law case or anything is binding, and let's assume that, or at least it's put sense and we should follow it. How do you meet that standard? How did you show that it is not reasonably ascertainable as opposed to you chose not to do it? Well, we met that standard by showing that in these cases with commission brokers, monies can come in after the 15th of the month, and they would have to wait until the 30th to determine whether those monies came in. So in the case of money coming in, that's what the record shows, not on sales made? That's the practice, yeah. Your Honor, I'm not stating that we have the actual records of what sales came in for Mr. Fugel during the month of November. Sauce for the goose, sauce for the gander. If you're supposed to put in evidence, you're supposed to put in evidence. Well, the other issue is in order for the penalty to be applied, there has to be a showing that it was willful, and there's absolutely no evidence that Morgan Stanley was willful on this issue. Willful in this circumstance, I think, means there's the law, you saw the law, you didn't do it. I mean, it doesn't have to be malicious. It's just you didn't pay. Well, a good faith belief that you're complying with the law should excuse you from any statutory penalty. And where does that come from? As we just said, the only piece of paper that deals with this says that you have to show that it's not reasonably ascertainable, as opposed to it's not your practice to ascertain it. Is there anything to demonstrate that? Just Mr. Albert's declaration, which describes the practice. There is nothing in the record that is specific as to Mr. Pugel's financial transactions. The practice is for the convenience of the company. Well, I think you have to take a reasonable approach at what a company should reasonably require to do. If you're discharging someone, that's the time to give them their money. Well, they gave them the money that was – I'm not saying wait another two weeks or three weeks. I mean, they've already swallowed one bitter pill. Maybe they don't have any money to get through the end of the month. There's no reason why you can't calculate it like that. You sell stock, they calculate the commission, you know, before they even sell the stock sometime. Well, they did pay them the money that was ascertainable at the time on the 15th. The other monies came in, you know, 18 days later or whatever the mathematical calculation is. I mean, that's what you say. Well, that's not disputed that he received the money on December 13th. Oh, that he received the money. Yes. You know, I understand that part. But what you say is that the other monies coming in from which to calculate the commissions and so on, that sounds like that's just kind of maybe could have happened. I don't know. Possibility is custom. Well, I think it's unreasonable to impose that requirement under these circumstances, frankly, based on this record because the companies has a practice of calculating all of this money and the commissions that are owed. This is why I don't understand your argument. You also have a practice of paying people bimonthly rather than weekly. But if somebody leaves earlier, you have to pay them. So how is it different? Well, they shouldn't be required to, you know, restructure the entire FAA comp calculation. The whole California code is restructuring your payment schedule, right? Because you don't pay people on any – you pay people on some regular schedule. And the regular schedule presumably is altered if those people are fired. Right? That's correct. So your schedule is already screwed up. So why is this different? Well, it's different because under the policy at the time, it wasn't earned until they've been able to determine what monies have come in throughout the entire period. I recommend you have a conversation either with Sacramento to change the law to the guys who make the payments in your company upon firing so that they can comply with California law or compile a record as to why they can't, or in the next case you get like this, compile yourself a record that makes it clear why you cannot comply with it. There's not a lot of money at stake on this point, obviously. Understood. What was the reason for keeping on employees who finished for less than two years or less than 36 months and getting rid of employees who had been with the company for a longer period? Well, it was entirely production-driven and age-neutral. The determination was made that people who had not been there a long enough period of time did not have a sufficient track record on which to make a decision. Well, that's not production-driven. It may be sort of fairness-driven, but it's not production-driven because you don't know, but they may be terrible. Well, that's correct, and it is determined that there's a learning period in which they must evaluate whether they can meet the production standards. Brokers who had been there for a long period of time have had that learning period, and they can make that decision. Are these brokers paid a salary? They're paid a draw against commission. That's the type of salary. So if they don't sell anything, they don't make any money? If they don't sell anything, they'll probably be terminated earlier. But here you have a – I mean, there is something odd about this whole system, and I have a healthy suspicion of what the numbers would demonstrate if we had them, because you have a situation where you know that this guy was at least producing a fair amount, and you have these other people that you have no idea what they're producing, and you decide to prefer the people that you don't know anything about because you don't know anything about them. That's at least unusual. Well, they do know something about them. And then they see the production that they're generating at the time. But they were just not included in this particular process. If they're not producing, they're going to be terminated. But it does take a period of time to learn. In this election process, those people were excluded. But they're not necessarily excluded. When people are terminated, who keeps the account? When people are terminated, they can take the account with them. It's the customer's decision. Yeah, but the company jumps in quickly. Well, there's a competition. As I understand it, it's nothing in the record, but as I understand it, there is competition for the account. Yeah, someone can have a fairly decent account, and the person is terminated. And before the person sort of recovers from the shock, the company's already contacted the customers and done its best to keep them in the hands of some other broker or salesman with the company. Your Honor, there's absolutely no evidence of that occurring in this case. But, I mean, that's what happens. No, that's not what happens. I mean, that's what happens in the ordinary course of business. Well, it depends. It's happened to me every time. I've switched, you know, or they've fired the salesman, and I stay with the salesman. I get all these solicitations. Well, what often happens is the financial— Is it a method for picking up a lot of gold coins from the ground? No, not based on my understanding. It's not at all. The customers are often very loyal to the financial advisor, and frankly, I don't know what the record would show in this case. But what often happens is the financial advisor leaves on a Friday evening, solicits all his customers. So that's, at this point, speculation, but I don't think that there's any evidence. Most of the customers are brought in by the financial advisor. Often they are. Sometimes they're not. But those who are loyal to the financial advisor always have the opportunity to stay with the financial advisor. It's entirely the customer's choice. But there's no evidence that this was part of some scheme to deprive Mr. Fugel or anyone else of their customers. They have the absolute right to follow the financial advisor wherever he or she may go. If you have no further questions, I have nothing further. Okay. Thank you. Matt, you want to say something in rebuttal or you've gone over your time, but we'll give you a minute. A minute is the point of the matter is I think on close examination of this plan, what was not considered like past performance, like the shift from commissions to asset-based, just the common sense thing that you knew perfectly well they did this blindly because they didn't want to have any evidence that would have generated lawsuits. That's how they figured it. They figured they would keep it so there was no evidence available. Okay. Thank you. Thank you. The matter is submitted. We will now take up SEC v. Alan Pham.
judges: Pregerson, W. Fletcher, Berzon